# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 14-50649
consolidated with No. 14-50673

United States Court of Appeals
Fifth Circuit

**FILED**

February 26, 2015

Lyle W. Cayce
Clerk

MID-CONTINENT CASUALTY COMPANY,

Plaintiff - Appellant

v.

KIPP FLORES ARCHITECTS, L.L.C.,

Defendant - Appellee

Appeals from the United States District Court
for the Western District of Texas
USDC No. 1:13-CV-60

Before KING, DAVIS, and OWEN, Circuit Judges.

PER CURIAM:*

Following a jury trial in a prior lawsuit, Defendant-Appellee Kipp Flores Architects, LLC ("KFA"), an architecture firm, obtained a judgment against a builder, Hallmark Design Homes, L.P. ("Hallmark"), for copyright infringement for building hundreds of buildings from its designs without licensing them. Plaintiff-Appellant Mid-Continent Casualty Company ("Mid-Continent"), Hallmark's insurer, filed this declaratory judgment action against KFA, seeking a declaration that it has no duty to indemnify under the

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-50649 consolidated with No. 14-50673

applicable policies. Mid-Continent claimed the policies did not cover copyright infringement directly, only advertising injury arising out of copyright infringement, and that the prior judgment did not establish advertising injury. The parties filed cross motions for summary judgment. The judge granted KFA's motion and denied Mid-Continent's, rendering judgment against the Mid-Continent in the amount of the prior judgment plus attorney's fees. Mid-Continent appealed, arguing that it has no duty to indemnify but, in the event it does, the attorney's fees award is not supported under Texas law.[1] For the reasons set out below, we affirm.

## I.     BACKGROUND[2]

KFA is an architecture firm that designs homes and then licenses those designs to other companies to build. Hallmark, a homebuilder in the Houston, Texas area, entered into several architectural services and license agreements with KFA. Under these agreements, KFA agreed to supply Hallmark with 11 different house designs, each of which Hallmark was authorized to build once. If Hallmark wished to build any copy after that first licensed copy, it was required to pay KFA in advance for a license. Under the agreements, Hallmark's failure to pay for a license for reuse of a plan rendered null and void KFA's grant of the right to reuse it.

After building the first licensed copy of each of the 11 house plans, Hallmark built several hundred more copies without paying KFA. When KFA discovered Hallmark's actions, it sued Hallmark for copyright infringement, seeking actual damages or, in the alternative, statutory damages for the

---

[1] Because the district court had diversity jurisdiction under 28 U.S.C. § 1332, this court has jurisdiction under 28 U.S.C. § 1291.

[2] Unless otherwise noted, the undisputed facts in this section come from the district court's opinion, *see Mid-Continent Cas. Co. v. Kipp Flores Architects, LLC*, No. 1:13-CV-60-JRN, 2014 WL 3417544 (W.D. Tex. Apr. 3, 2014), as well as the pleadings in the prior suit, the agreements between KFA and Hallmark, and the policies Mid-Continent issued to Hallmark.

No. 14-50649 consolidated with No. 14-50673

infringement under 17 U.S.C. § 504. In its Second Amended Complaint, KFA specifically asserted:

> Defendants have created, published and used non-pictorial depictions of structures based on KFA's Copyrighted Works in promotional and advertising materials. Defendants have published and used these infringing materials in the course of advertising their infringing structures. Furthermore, defendants have used the structures themselves to advertise their infringing structures. These infringing advertising activities have resulted in the sales of infringing structures described above. Furthermore, these infringing advertising activities, and the resulting infringing sales, are and have been a substantial factor in the value of any infringing structures that defendants have not yet sold, and the prices that buyers would be willing to pay for such structures.

Hallmark filed for bankruptcy before trial, but the trial went forward because Hallmark was potentially covered by the Mid-Continent policies at issue in this action. The jury returned a verdict in favor of KFA on September 12, 2012, finding that Hallmark had infringed all 11 of KFA's designs and finding the amount of profit attributable to the infringement. The district court entered a final judgment on October 4, 2012, establishing that Hallmark had infringed KFA's copyrights and allowing KFA an unsecured claim in Hallmark's bankruptcy in the amount of $3,231,084 plus taxable costs of $8,604.40. The Fifth Circuit affirmed.[3]

On January 23, 2012, Mid-Continent filed this action seeking a declaratory judgment that it had no duty to indemnify under the policies it issued to Hallmark. The policies, discussed in detail below, generally exclude coverage for copyright infringement, but they exempt from that exclusion—i.e.,

---

[3] *Kipp Flores Architects, L.L.C. v. Hallmark Design Homes, L.P.*, 544 F. App'x 553, 554 (5th Cir. 2013).

3

No. 14-50649 consolidated with No. 14-50673

cover—an "advertising injury" arising out of infringement in Hallmark's "advertisement," as defined in the policies. The policies also provide that the holder of a judgment against Hallmark may recover under the policies.

Mid-Continent filed a motion for summary judgment, seeking a judgment that the policies do not provide coverage for the judgment of copyright infringement for a number of reasons. Most notably, Mid-Continent argued that the prior judgment was not for a covered "advertising injury" because the infringement did not take place in an "advertisement" as defined in the policies. KFA filed a cross-motion for partial summary judgment claiming the policies do cover the prior judgment. The district court granted KFA's motion and denied Mid-Continent's, and it awarded attorney's fees to KFA under Texas law based on KFA's contingency fee arrangement with its attorneys.

Mid-Continent appealed both the coverage and attorney's fees issues on a number of grounds. For the reasons set out below, we affirm.

## II.   DISCUSSION

### A.   Applicable Law And Policy Language

This court "review[s] a district court's grant of summary judgment de novo," applying the usual standards under Fed. R. Civ. P. 56.[4] The parties agree that Texas law governs this insurance dispute, so we must look to state law for the rules of policy interpretation and the burden of proof.

#### 1.   Interpretation of Insurance Contracts

Texas's rules for interpreting insurance contracts are straightforward:

> Texas courts "construe insurance policies according to the same rules of construction that apply to contracts generally." When interpreting insurance contracts, courts seek "to ascertain the true intentions of the parties as expressed in the instrument." To this end,

---

[4] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

No. 14-50649 consolidated with No. 14-50673

Texas courts "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless," give policy terms "their ordinary and commonly understood meaning unless the policy itself shows the parties intended a different, technical meaning," and "strive to honor the parties' agreement and not remake their contract by reading additional provisions into it[.]"

Moreover, courts must decide if a contract contains ambiguous provisions. If the contract "can be given a definite or certain meaning as a matter of law," courts will not consider the contract to be ambiguous. A provision is not ambiguous "simply because the parties interpret a policy differently." Rather, a court will find a term ambiguous if "the language of a policy or contract is subject to two or more reasonable interpretations." If a contract is ambiguous, such ambiguity will be construed against the insurer.[5]

## 2.    Burden of Proof on Coverage and Exclusions

Texas law recognizes that "the duty to defend and the duty to indemnify 'are distinct and separate duties.'"[6] Because Mid-Continent already paid for Hallmark's defense in the first suit, this suit does not concern the duty to defend but the duty to indemnify.

> While analysis of the duty to defend has been strictly circumscribed by the eight-corners doctrine, it is well settled that the "facts actually established in the underlying suit control the duty to indemnify." As with any other contract, breach or compliance with the terms of an insurance policy is determined not by pleadings, but by proof. . . .

---

[5] *United Nat. Ins. Co. v. Mundell Terminal Servs., Inc.*, 740 F.3d 1022, 1027 (5th Cir. 2014) (citations omitted).

[6] *D.R. Horton-Texas, Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 743 (Tex. 2009) (hereinafter *Horton*) (quoting *Utica Nat'l Ins. Co. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004)).

No. 14-50649 consolidated with No. 14-50673

> The insurer's duty to indemnify depends on the facts proven and whether the damages caused by the actions or omissions proven are covered by the terms of the policy. Evidence is usually necessary in the coverage litigation to establish or refute an insurer's duty to indemnify.[7]

The major issue in this case is whether the underlying judgment, which established that Hallmark infringed the copyrights of KFA by constructing homes from KFA's designs without a license to do so, triggered coverage for an "advertising injury" under the policy terms.

### 3. Policy Language

Five successive one-year policies were in effect from May 28, 2004 to May 28, 2009, but the relevant language is the same in each. Under COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY, the policies provide:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. . . .

The policies define "personal and advertising injury" as "injury . . . arising out of one or more of the following offenses: . . . infringing upon another's copyright, trade dress or slogan in your 'advertisement.'" Section V.1 of the policies defines "advertisement" as follows:

> 1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for

---

[7] *Id.* at 744 (citations omitted).

No. 14-50649 consolidated with No. 14-50673

the purpose of attracting customers or supporters. For the purposes of this definition:

> a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

> b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purpose of attracting customers or supporters is considered an advertisement.

Finally, the policies provide an exclusion for most copyright infringement *except* for infringement in advertisements:

> **2. Exclusions**

> This insurance does not apply to:

> > **i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

> > "Personal and advertising injury" arising out of the    infringement of copyright, patent, trademark, trade   secret or other intellectual property rights.

> However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

## III.    MID-CONTINENT OWES A DUTY TO INDEMNIFY.

Mid-Continent argues: (a) there is no coverage because the prior judgment did not concern an "advertising injury" on its face; (b) KFA relied primarily on the use of the houses as "advertisements," but a house cannot be an advertisement under the policies; (c) KFA has not shown sufficient causation under the policies; and (d) assuming it can recover at all, KFA failed to segregate covered damages from non-covered damages. We find no merit in any of these arguments.

No. 14-50649 consolidated with No. 14-50673

**A.    The Hallmark Judgment Adjudicated The Facts Necessary To Establish An "Advertising Injury" If A Model Home Can Be An "Advertisement" Under The Policy.**

Mid-Continent argues that the policy language cited above does not cover the copyright infringement judgment in this case because the previous judgment said nothing of "advertising injury," and the jury never had to decide whether there was an advertising injury. Mid-Continent's interpretation of the prior judgment is also too narrow.

In its order on cross motions for summary judgment, the district court set out the following test for determining whether a policy covers "advertising injury": "(1) the allegations in the underlying complaint must raise a 'potential' for liability under one of the covered offenses stated in the policy; (2) the insured must have engaged in 'advertising activity' during the policy period when the alleged 'advertising injury' occurred; and (3) there must be a causal connection between the alleged injury and the 'advertising activity.'"[8] The district court concluded that the *Hallmark* judgment directly established an "advertising injury" under that test because, even though the prior verdict did not "identically mirror" the policy language, the prior judgment:

> conclusively establishes Hallmark's liability to KFA for copyright infringement, including copyright infringement committed in connection with Hallmark's 'advertising.' That is a covered offense explicitly stated in Mid–Continent's policies. Additionally, the record conclusively establishes that Hallmark engaged in "advertising activities" (in both website and print advertising and the use of infringing houses in its marketing activities) during the policy periods.[9]

---

[8] 2014 WL 3417544 at *3 (citing *Bay Elec. Supply, Inc. v. Travelers Lloyds Ins. Co.*, 61 F.Supp.2d 611, 615 (S.D. Tex. 1999), and *Sentry Ins. v. R.J. Weber Co., Inc.*, 2 F.3d 554 (5th Cir. 1993)).

[9] *Id.* (citations to record omitted).

No. 14-50649 consolidated with No. 14-50673

Mid-Continent correctly argues that the district court applied the wrong test. The test the district court used was based on duty to defend cases, which, as noted above, rely on the eight-corners doctrine (i.e., the language of the complaint and the language of the policy) to determine whether the plaintiff has stated a potentially coverable claim.[10] Instead, the district court should have applied the duty to indemnify test set out in *Horton*: "The insurer's duty to indemnify depends on the facts proven and whether the damages caused by the actions or omissions proven are covered by the terms of the policy. Evidence is usually necessary in the coverage litigation to establish or refute an insurer's duty to indemnify."[11]

That does not change the result here under de novo review, however. Mid-Continent's emphasis on the prior judgment's failure to specifically refer to an "advertising injury" is an unduly narrow view of the "facts proven" rule. As the Texas Supreme Court noted in *Horton*, a coverage suit often requires the parties to submit evidence of facts which were not specifically covered at the earlier trial. In footnote 3 of *Horton*, the court cited with approval a Fifth Circuit case applying Texas law in which this court reasoned:

> Finally, we find that the district court properly concluded that Appellees may present evidence at trial regarding facts necessary to determine coverage that were not adjudicated in the underlying case. The underlying case often does not resolve all the factual issues necessary to determine coverage because issues relevant to the question of coverage can be irrelevant to the question of the insured's liability. *See Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 204 (Tex. 2004) ("It may sometimes be necessary to defer resolution of indemnity issues until the liability litigation is resolved."). . . . Therefore, courts

---

[10] *Bay Electric Supply* and *Sentry* addressed the duty to defend, not the duty to indemnify, with respect to the pleadings test.

[11] 300 S.W.3d at 744.

No. 14-50649 consolidated with No. 14-50673
are not precluded from making factual findings in coverage actions. Otherwise, insureds . . . can never establish coverage whenever there is an underlying trial and an issue irrelevant to liability but essential to coverage.[12]

In this case, the issue of "advertising injury" was irrelevant to copyright infringement liability but is essential to coverage under the policy. For the copyright infringement claim, the jury was only required to find that Hallmark infringed KFA's copyright with respect to the 11 home designs, not to make a special finding concerning whether or not that infringement took place in an "advertisement" within the terms of the policy.

Because the jury determined that the houses themselves infringed KFA's copyright, the determinative question for coverage under the policies is whether the houses themselves were "advertisements" such that the jury verdict potentially gives rise to coverage as an "injury . . . arising out of . . . infringing upon another's copyright, trade dress or slogan in your 'advertisement.'" The outcome here is determined both by the policy language and by the fact that KFA has presented ample evidence that Hallmark used the infringing houses for marketing purposes, and Mid-Continent has never offered any evidence to the contrary.

## B.    Under The Policy Terms And The Uncontroverted Facts, The Infringing Houses Were "Advertisements."

Even though the prior suit did not require KFA to present evidence concerning advertising, KFA presented a great deal of evidence on the subject. KFA has always contended that Hallmark infringed KFA's copyright in its advertisements and that the structures themselves constituted advertisements. Beyond these contentions, KFA presented evidence that the

---

[12] *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp.*, 532 F.3d 398, 404 (5th Cir. 2008) (footnote omitted).

houses themselves were used to attract customers, in addition to evidence of website and print promotional materials. Indeed, on appeal in this case, Mid-Continent concedes that KFA presented evidence that the houses themselves were Hallmark's primary form of marketing.[13]

One of Hallmark's representatives testified in deposition in this suit that homebuyers never bought houses sight unseen, but rather would look at the model homes Hallmark built as well as elevations and floor plans in the sales office or on the website. In addition, Hallmark put up yard signs with its contact information on the sites of homes it built to attract customers.

Mid-Continent does not dispute the fact that Hallmark used the infringing homes themselves to market to customers, so we must accept that fact as true under Rule 56. Rather than attack the facts, Mid-Continent argues that an infringing house can never be an "advertisement" under the policies as a matter of law. Again, the policies define "advertisement" as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters." Mid-Continent argues that, under the policy terms and common sense, a house cannot be a "notice," and it cannot be "broadcast or published." Mid-Continent cites no controlling authority that might require the narrow reading proposed.

It is important to note that the policies never specify that "notice" must take any particular form (e.g., a writing or a website) and never exclude from the definition a physical object, nor do they define "broadcast" or "published." Among other things, the Oxford English Dictionary defines "notice" sweepingly as the "act of imparting information" or "something which imparts

---

[13] Mid-Continent also concedes that Hallmark infringed KFA's copyright in at least one non-house advertisement, but the bulk of its appeal focuses on whether or not the houses were "advertisements" under the policies.

No. 14-50649 consolidated with No. 14-50673

information."[14] The few cases interpreting the policy language at issue here ("a notice that is broadcast or published") have construed "notice" very broadly.[15] Under the policy language, such notice need only be broadcast *or* published to qualify as an advertisement. While "broadcast" generally implies radio or television advertisement,[16] "publish" is much more comprehensively defined as "to make public or generally known" or "to make generally accessible or available for acceptance or use (a work of art, information, etc.); to present to or before the public."[17] Thus, the policy language does not support the restrictions Mid-Continent proposes.

Texas law also does little to limit the policies' expansive definition of "advertisement." In *Sport Supply Grp., Inc. v. Columbia Cas. Co.*, 335 F.3d 453 (5th Cir. 2003), we summarized Texas law on the subject:

> The Texas Supreme Court, in another context, adopted the following definition of "advertise":
>
> > **To advise, announce, apprise, command, give notice of, inform, make known, publish. On [(sic.)] call to the public attention by any means whatsoever.** Any oral, written, or graphic statement made by the seller in

---

[14] *See* "notice, *n.*" *OED Online*. December 2014. Oxford University Press. http://www.oed.com/view/Entry/128591 (accessed February 23, 2015).

[15] *See AMCO Ins. Co. v. Lauren-Spencer, Inc.*, 500 F. Supp. 2d 721, 728-29 (S.D. Ohio 2007) ("Nowhere in that definition are the specific requirements that AMCO seeks to impose, and the insurance company's reliance on the term 'notice' to backdoor the requirements into the policy is of no avail."); *Acuity v. Ross Glove Co.*, 2012 WI App 70, ¶¶ 12-13, 344 Wis. 2d 29, 42-43, 817 N.W.2d 455, 462 (Wis. Ct. App. 2012) (finding that "Ross Glove packaging, with its distinctive shape, form and appearance, is a 'notice' that, for the purpose of attracting customers, misrepresents Ross Glove's packaged products as those of Seirus").

[16] The Oxford English Dictionary defines "broadcast" in part as "[t]o disseminate (a message, news, a musical or dramatic performance, or any audible or visible matter) from a radio or television transmitting station to the receiving sets of listeners and viewers; said also of a speaker or performer." *See* "broadcast, *v.*" *OED Online*. December 2014. Oxford University Press. http://www.oed.com/view/Entry/23508 (accessed February 23, 2015).

[17] *See* "publish, *v.*" *OED Online*. December 2014. Oxford University Press. http://www.oed.com/view/Entry/154072 (accessed February 23, 2015).

No. 14-50649 consolidated with No. 14-50673

> any manner in connection with the solicitation of business and includes, without limitation because of enumeration, statements and representations made in a newspaper or other publication or on radio or television or contained in any notice, handbill, sign, catalog, or letter, or printed on or contained in any tag or label attached to or accompanying any merchandise.

> *Smith v. Baldwin*, 611 S.W.2d 611, 614–15 (Tex. 1980) (interpreting the term "advertising" under the Texas Deceptive Trade Practices Act); *see First State Bank v. Keilman*, 851 S.W.2d 914, 922 (Tex. App.—Austin 1993, writ denied). **The Texas Supreme Court further indicated that "advertising" is a "marketing device[] designed to induce the public to patronize" a particular establishment.** *Smith*, 611 S.W.2d at 615; *see id.* (suggesting that **"advertising" is "a public notice drawing attention to" the attributes of a business**).The Texas Supreme Court's definition of "advertising" would seem to accord with our common understanding of the term as referring to a device for the solicitation of business. *See Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 748 (3d Cir. 1999). . . .[18]

In this case, it is undisputed that Hallmark's primary means of marketing its construction business was through the use of the homes themselves, both through model homes and yard signs on the property of infringing homes it had built, all of which were marketed to the general public. Mid-Continent even contends there is no evidence that Hallmark's customers saw any marketing materials other than the houses themselves. Under the undisputed facts, Hallmark's use of the infringing houses satisfies not only the policies' expansive definition of "advertisement" and Texas law's similarly

---

[18] 335 F.3d at 462-63 (emphasis added).

No. 14-50649 consolidated with No. 14-50673

broad construction of the term but also common sense.[19] We therefore conclude that the infringing houses in this case, as used by Hallmark, all qualify as "advertisements" under the policies.[20]

## C.    Hallmark's Liability In The Prior Judgment Was "Because Of" A Covered Advertising Injury.

The policies provide that Mid-Continent "will pay those sums that the insured becomes legally obligated to pay as damages *because of* 'personal and advertising injury,'" which the policy defines as "injury . . . *arising out of* one or more of the following offenses: . . . infringing upon another's copyright, trade dress or slogan in your 'advertisement.'" Because we conclude that Hallmark infringed KFA's copyright in its advertisement, the policies define the resulting injury as an "advertising injury," i.e., an injury *arising out of* the infringement in the advertisement. KFA's judgment against Hallmark therefore is *because of* that advertising injury. Under the plain language of the policy, Mid-Continent owes a duty to indemnify.

---

[19] We have found one other case that addressed the use of homes in the "advertising injury" context, and it, too, found that such marketing triggered coverage. *See King v. Cont'l W. Ins. Co.*, 123 S.W.3d 259, 265 (Mo. Ct. App. 2003) (noting that "one of the best ways to advertise the goods and services of a building constructor is to put signs outside of construction sites so that potential customers can tie the quality of workmanship to the builder" and that "[a] contractor putting its sign up next to the home it is building, without stating so, is placing it there to attract the attention of potential homebuyers.").

[20] We are not swayed by Mid-Continent's argument that the policy excludes coverage for Hallmark's marketing activities because advertising necessarily is an activity or item distinct from the product being advertised. *See Ekco Group, Inc. v. Travelers Indem. Co. of Ill.*, 273 F.3d 409 413 (1st Cir. 2001) ("Although the term 'advertising' has a range of meanings, the one that leaps to mind in reading this policy is what is surely the most common use: as a reference to advertising in newspaper, radio, television, or other familiar media where the advertisement is an activity or item distinct from the product being advertised."); and *Krueger Int'l, Inc. v. Fed. Ins. Co.*, 647 F. Supp. 2d 1024, 1035 (E.D. Wis. 2009)) (citing cases for that proposition). These cases do not take into account the facts peculiar to Hallmark's business and the broad policy language at issue here. Here, the use of the homes unquestionably was Hallmark's primary—indeed, nearly only—means of marketing its services.

No. 14-50649 consolidated with No. 14-50673

Mid-Continent argues that the district court applied the wrong causation standard to draw a link between the prior judgment and coverage under the policies, but Mid-Continent has not offered any reasonable construction of the policy language that would preclude coverage. Mid-Continent also argues that to prove an "advertising injury," a plaintiff must prove that the infringing advertisement swayed a particular buyer's decision, but the policies do not contain such a requirement, and we find no case law to support that proposition.

**D.    KFA Is Not Barred From Recovery Under The Concurrent Causation Doctrine.**

Mid-Continent argues that even if the houses are treated as "advertisements," the damages award in the prior judgment included both covered "advertising injury" damages (for the infringement in Hallmark's advertisements, including the use of model homes) and non-covered damages for infringement in the construction and sale of the houses themselves. Thus, Mid-Continent argues, all of the damages are barred under the concurrent causation doctrine, citing *Utica*, *supra*. The argument is without merit because even assuming *arguendo* that we were to find two distinct kinds of infringement in the prior judgment, the damages would not be subject to the concurrent causation doctrine.

In *Utica*, the Texas Supreme Court explained:

> Texas courts and the Fifth Circuit applying Texas law have recognized a distinction between cases involving "separate and independent" causation and "concurrent" causation when both covered and covered [sic] and excluded events cause a plaintiff's injuries. In cases involving separate and independent causation, the covered event and the excluded event each

15

No. 14-50649 consolidated with No. 14-50673

independently cause the plaintiff's injury, and the insurer must provide coverage despite the exclusion.[21]

Among other examples of the separate and independent causation doctrine, the court cited *Guaranty Nat'l Ins. Co. v. North River Ins. Co.*, 909 F.2d 133, 137 (5th Cir. 1990), in which we held that a patient's suicide was proximately caused by both a hospital's failure to secure its windows and its failure to supervise the patient, such that an exclusion under the policy for liability "due to . . . the rendering of or failure to render . . . any service or treatment conducive to health or of a professional nature. . ." did not apply.[22]

The Texas Supreme Court explained, on the other hand, that

> [i]n cases involving concurrent causation, the excluded and covered events combine to cause the plaintiff's injuries. Because the two causes cannot be separated, the exclusion is triggered. *See Travelers Indem. Co. v. Citgo Petroleum Corp.*, 166 F.3d 761, 771–72 (5th Cir. 1999) (holding that, under Texas law, liability for failing to follow separate corporate safety standards was necessarily derivative of excluded negligent driving claim); *Burlington Ins. Co. v. Mexican Am. Unity Council*, 905 S.W.2d 359, 363 (Tex. App.-San Antonio 1995, no writ) (holding that, because negligent supervision of youth home resident and the assault and battery which caused her injuries were not "separate and independent," an assault and battery exclusion applied); *Thornhill v. Houston Gen. Lloyds*, 802 S.W.2d 127, 130 (Tex. App.-Fort Worth 1991, no writ) (holding that, because the claims were "related and interdependent," sale-to-minors exclusion in general liability policy applied to claims that a store was negligent in selling alcohol to minors as well as training its employee on permissible purchases).[23]

---

[21] 141 S.W.3d at 204.

[22] 909 F.2d at 135.

[23] *Utica*, 141 S.W.3d at 204.

No. 14-50649 consolidated with No. 14-50673

In the prior suit, KFA claimed that Hallmark infringed its copyright in a number of ways, but that infringement gave rise to a single recovery. Even if, as Mid-Continent urges, we could distinguish between copyright infringement in the construction and sale of the houses and infringement in Hallmark's use of the houses as advertisements, copyright law does not distinguish between those infringements for purposes of damages. Under 17 U.S.C. § 504, KFA was entitled to choose between either actual damages and profits (subsection (b)) or statutory damages (subsection (c)) for each infringement. KFA ultimately was awarded actual damages in the prior judgment under § 504(b):

> **(b) Actual Damages and Profits.**--The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.[24]

In essence, copyright law would have granted KFA the full recovery for any type of infringement. There is no correlation between one type of infringement and any other. Because infringement in an advertisement would give rise to precisely the same damages as infringement by construction and sale, the two causes are separate and independent, and the full recovery therefore is covered as an advertising injury.

## IV.  MID-CONTINENT HAS NOT ASSERTED A VIABLE DEFENSE.

Because we conclude that KFA has satisfied its burden of proving coverage under the terms of the policies, the burden shifts to Mid-Continent to

---

[24] 17 U.S.C. § 504(b) (West 2012).

No. 14-50649 consolidated with No. 14-50673

prove that an exclusion applies.[25] If Mid-Continent succeeds in doing so, the burden shifts back to KFA to prove some exception to the exclusion.[26] In this coverage, suit, however, Mid-Continent may be barred from re-litigating an issue if: "(1) the issue raised in the coverage suit was raised and determined in the liability suit; (2) the issue determined in the liability suit was essential to the judgment in the liability suit; and (3) the necessary requirement of privity exists between the insurer and the insured."[27] It is clear that Mid-Continent was in privity with Hallmark for the liability issues (i.e., whether or not Hallmark committed copyright infringement) but was not in privity with respect to coverage issues.

### A.    Mid-Continent Has Failed To Prove That The Breach Of Contract Exclusion Applies.

Mid-Continent relies on the rule that if an exclusion is even incidentally related to conduct that would otherwise be covered, the exclusion trumps.[28] Mid-Continent first points to the policies' breach of contract exclusion, which provides:

> **f. Breach of Contract**
>
> "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

Mid-Continent relies on the fact that KFA and Hallmark had entered into at least three architectural services agreements. It argues that Hallmark's failure to prepay for the reuse licenses of KFA's designs constituted a breach of contract. Mid-Continent relies on the testimony of KFA's representative at

---

[25] *Gilbert Texas Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010).

[26] *Id.*

[27] *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 110 (5th Cir. 2010) (*Bay Rock*).

[28] Mid-Continent cites *Sport Supply, supra*; and *Gemini Ins. Co. v. The Andy Boyd Co. LLC*, 243 F. App'x 814, 815 (5th Cir. 2007).

trial that Hallmark failed to follow the contract's requirement to notify KFA of its intent to reuse KFA's designs.

In the prior suit, KFA stated a claim only for copyright infringement, not breach of contract, and neither KFA nor Hallmark argued in the prior trial that Hallmark breached the agreements. KFA contended that the consequences of Hallmark's failure to secure a reuse license were already addressed in the agreements themselves by stipulating that Hallmark's licenses would lapse. Notwithstanding the agreements' provisions terminating its licenses, Hallmark argued unsuccessfully that KFA never terminated the agreements, so it had granted Hallmark an implied license to continue using KFA's designs. The agreements provided, in relevant part:

> Client's failure to pay all charges for services requested by Client, including fees for purchase of license for reuse of plan(s), shall make this granting of the right to reuse plan(s) null and void. Client's right to reuse plans lapses if Client fails to report construction and remit payment for license for a period of one year, or fails to report construction for application of prepaid license fees for a period of one year.

The entire prior suit was based on copyright infringement, which could only have arisen after the clause stripped Hallmark of its license. All of the damages in the prior judgment arose under copyright law, not breach of contract law. These facts, coupled with the fact that neither KFA nor Hallmark ever argued there was a breach of contract, suggest that the prior judgment was not related to breach of contract. We conclude that Mid-Continent has failed to carry its burden of proving that the breach of contract exclusion applies.

### B.     Mid-Continent Has Failed To Prove That The "Prior Publication" Exclusion Applies.

Mid-Continent also argues that the "prior publication" exclusion applies:

No. 14-50649 consolidated with No. 14-50673

### c. Material Published Prior To Policy Period

"Personal and advertising injury" arising out of oral or
written publication of material whose first publication
took place before the beginning of the policy period.

Mid-Continent claims that the purpose of the exclusion is to preclude coverage where the risk had already materialized prior to the beginning of coverage. There is some question as to whether the exclusion would apply to a string of distinct acts of copyright infringement, as opposed to the situation where an advertisement was published prior to the policy period but continued to give rise to harm afterward.[29] We need not address that issue here, however, because under the broadest interpretation, Mid-Continent has failed to carry its burden of proving the exclusion applies.

The first policy period began on May 28, 2004. Mid-Continent has not pointed to any infringement or other advertising injury prior to that date. Mid-Continent asserts, for example, that KFA provided artwork for a certain house plan, the Versailles model, in 2003, and that Hallmark began using it in brochures that were available in model homes within a month. It also points to the fact that Hallmark put the Versailles plan on its website prior to May 28, 2004. The record also shows that the Versailles model was first built or sold on January 13, 2004. The record reveals was no other home built prior to May 28, 2004. Because Hallmark retained its license until it built the second copy of the home without a reuse license, none of the pre-policy conduct infringed KFA's copyright. Even under a broad construction of the "prior publication" exclusion, Mid-Continent has not carried its burden of proving that any "advertising injury" occurred prior to the first policy period.

---

[29] *See, e.g., Ryland Grp., Inc. v. Travelers Indem. Co. of IL*, No. CIV. A-00-CA-233 JRN, 2000 WL 33544086, at *8 (W.D. Tex. Oct. 25, 2000) (footnotes omitted) (discussing cases).

No. 14-50649 consolidated with No. 14-50673

Next, Mid-Continent argues that the prior publication exclusion applies to each infringing advertisement within the policy periods, so Mid-Continent is not liable to pay under later policy periods for advertisements that were first published under earlier policy periods. Because the five insurance agreements are virtually identical and Mid-Continent remained the insurer throughout, Mid-Continent still would be liable for the consequences of the advertising injuries, all of which began during a covered period. Mid-Continent has shown no reason why the distinction would make a difference. In sum, the "prior publication" exclusion does not apply to these facts.

## C.    Mid-Continent Is Not Entitled To Assert A Defense To The Copyright Infringement Because The Issue Of Copyright Infringement Was Adjudicated In The Prior Suit.

Next, Mid-Continent argues that, under § 120(a) of the Architectural Works Copyright Protection Act, 17 U.S.C. § 120(a), Hallmark's use of KFA's designs did not actually constitute copyright infringement. Even though the prior case involved copyright infringement, Mid-Continent claims it is not barred from litigating this issue now because it is a "coverage defense."

In connection with coverage, Mid-Continent cannot ignore or relitigate facts actually established in the prior liability case.[30] The jury in the prior suit specifically determined that Hallmark infringed KFA's copyright. Because Mid-Continent's § 120(a) defense would require the court to overturn that finding, Mid-Continent may not assert it.

## D.    KFA Sufficiently Established The Amount Of Its Damages.

Mid-Continent argues that the policies cover when offenses occur and not when sales occur, so KFA cannot recover unless it ties each particular offense to one of the five policy periods rather than treating them as one five-year policy. As established above, Mid-Continent has not pointed to any offense

---

[30] *Bay Rock*, 614 F.3d at 110.

that took place prior to the first policy period. Mid-Continent also has not shown that KFA was awarded damages for any offense or sale that took place after the policy periods. Thus, all offenses or sales for which the district court awarded KFA damages must have taken place within one of the five policy periods. Mid-Continent was the insurer during all five policy periods. At best, this argument presents a distinction without a difference.

## V.   KFA IS ENTITLED TO THE FULL AWARD OF ATTORNEY'S FEES.

Finally, Mid-Continent argues that, even if KFA wins on the coverage issue and is therefore entitled to attorney's fees under Tex. Civ. Prac. & Rem. Code § 38.001 for breach of the insurance contract, the district court erred in awarding fees based on the contingency fee agreement between KFA and its attorneys minus a reduction for time spent outside of the breach of insurance contract claim, which represents a total recovery outside of costs of 33.8%.[31] Mid-Continent argues that Texas requires lodestar evidence for attorney's fees. That is not accurate. Texas courts permit otherwise reasonable contingency fee awards under § 38.001.

Interpreting Texas law, the Fifth Circuit permitted the imposition of a contingency fee in *Mathis v. Exxon Corp.*, 302 F.3d 448 (5th Cir. 2002):

> First, there is a rebuttable presumption of reasonableness for fees that are "usual" or "customary." Tex. Civ. Prac. & Rem. Code § 38.003 (Vernon 2002). Second, where the fees are tried to the court, as they were in this case, the statute authorizes the judge to take judicial notice of the "usual and customary fees" and the contents of the case file. Id. at § 38.004. Texas courts have upheld fee awards using these presumptions where the attorneys had a contingent fee arrangement. *Laredo Indep. Sch. Dist. v. Trevino*, 25 S.W.3d 263 (Tex. App.—San Antonio

---

[31] The district court awarded a net fee of $1,091,362.72, compared to the underlying judgment of $3,231,084.00, or approximately 33.8% of the judgment.

No. 14-50649 consolidated with No. 14-50673

2000, review denied) (40% contingency fee); *European Crossroads' Shopping Ctr., Ltd. v. Criswell*, 910 S.W.2d 45, 58–59 (Tex. App.—Dallas 1995, writ denied) (upholding jury award of 35% based only on attorney's own testimony). Plaintiffs' attorneys supported their fees by submitting an affidavit drafted by lead counsel and an affidavit of an attorneys' fees expert. Exxon countered by challenging the reasonableness of the total award. Under Texas law, the two affidavits, combined with the presumption of reasonableness and the court's ability to use judicial notice to guide the reasonableness finding is enough for us to conclude that the district court did not abuse its discretion in awarding fees as contemplated by plaintiffs' contingency fee contract.[32]

The Texas Supreme Court recently noted that lodestar evidence is not required for contingency fee awards but is required if a claimant wants to go above the contingency fee calculation:

> In addition to the lodestar method, the attorney's fee affidavit also indicates the Griffins and their attorneys agreed to a 35% contingency fee arrangement, which the affidavit claims is reasonable and customary for such a suit. *Even if supporting evidence is not required for the contingency fee method of proof (as it is for the lodestar method), the contingency fee method cannot support the trial court's fee award here because the final judgment awarded no monetary relief except for attorney's fees.* Because the contingency fee method cannot support the trial court's fee award, and no legally sufficient evidence supports the award under the lodestar method, we remand to redetermine attorney's fees.[33]

Mid-Continent's argument rests entirely on the proposition that KFA failed to submit lodestar evidence. Because Texas law does not require lodestar evidence for contingency fee arrangements and because Mid-Continent has not

---

[32] *Id.* at 462 (footnote omitted).

[33] *Long v. Griffin*, 442 S.W.3d 253, 256 (Tex. 2014) (emphasis added).

No. 14-50649 consolidated with No. 14-50673

shown that the fee is unreasonable, we cannot say that the district court abused its discretion in awarding the fee.

## VI.    CONCLUSION

For the reasons set forth above, we AFFIRM.